IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**ENTERED**
**10/01/2012**

|                               |     |                          |
| ----------------------------- | --- | ------------------------ |
|                               | )   |                          |
| IN RE                         | )   |                          |
|                               | )   |                          |
| TURNKEY E&P CORPORATION,      | )   | CASE NO. 08-37358-H3-7   |
|                               | )   |                          |
|          Debtor,              | )   |                          |
|                               | )   |                          |

<u>MEMORANDUM OPINION</u>

The court has held an evidentiary hearing on the "Final Application by Former Attorneys for Debtor-in-possession for Allowance of Compensation  of Fees and Reimbursement of Expenses" (Docket No. 696) filed by Looper Reed & McGraw, P.C.  The following are the Findings of Fact and Conclusions of Law of the court.  A separate conforming Judgment will be entered.  To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such.  To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Findings of Fact</u>

Turnkey E&P Corporation ("Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on November 17, 2008.  By order entered on November 16, 2009, the court directed appointment of a Chapter 11 Trustee.  (Docket No. 430).  Elizabeth M. Guffy was appointed as the Chapter 11 Trustee on November 20, 2009.  (Docket No. 436).  On the Trustee's motion,

the case was converted to Chapter 7 by order entered on June 7, 2010.  (Docket No. 515).  Guffy has remained as the Chapter 7 Trustee after conversion of the case to Chapter 7.

In the instant application, Looper Reed & McGraw, P.C. ("Applicant"), who was Debtor's counsel from the petition date through the date of appointment of the Chapter 11 Trustee, seeks final allowance of fees in the amount of $718,544.50, and expenses in the amount of $37,730.99, for services rendered during the period from November 17, 2008 through November 20, 2009.  (Docket No. 696).

The instant case was initially assigned to the Honorable Wesley W. Steen.  The case was reassigned to the undersigned judge on January 17, 2011, approximately seven months after the case was converted to Chapter 7.  (Docket No. 592).[1]

The Chapter 7 Trustee objects to the instant application, on grounds "Applicant's services provided little or no identifiable, tangible, and material benefit" to the bankruptcy estate.  Trustee asserts that the fees and expenses requested by Applicant, over and above the amount of interim

---

[1]The court notes that the entire period covered by the instant application took place before the instant case was assigned to this judge.  The court has taken judicial notice of the docket sheet and pleadings filed in the instant Chapter 7 case (including docket entries and pleadings entered prior to appointment of the Chapter 11 Trustee and conversion to Chapter 7).

post-petition payments received from Debtor, should be denied.
(Docket No. 706).

        The parties have stipulated that, including retainer
amounts drawn by Applicant, and fees and expenses paid pursuant
to an order setting forth procedures for the interim compensation
of professionals, Applicant has received $445,483.55. (Docket
No. 746).[2]

        At the hearing on the instant application, Micheal W.
Bishop, an attorney with Applicant, and the attorney in charge
for Debtor, testified that Debtor was an oil and gas exploration
company.  He testified that Debtor had oil and gas properties
located in Texas, Louisiana, and Wyoming, and also had four
specialized casing drilling rigs.

        Debtor's schedules indicate that Debtor valued its four
rigs on the petition date at an aggregate total amount of
$22,170,991.  Debtor scheduled eight pages of oil and gas leases

---

        [2]On January 30, 2009, Debtor filed a motion to establish
procedures for the interim compensation and reimbursement of
expenses of professionals. (Docket No. 114).  The motion was
granted by order entered on March 2, 2009. (Docket No. 171).
The procedures adopted called generally for professionals to
present to Debtor, the official committee of unsecured creditors
("Committee"), counsel for MCP Funding I, LLC ("MCP"), and the
U.S Trustee's office a monthly detailed statement.  If no
objection was filed, Debtor would pay 80 percent of the fees,
subject to the court's subsequent approval of interim fee
applications under Section 331 of the Bankruptcy Code. (Docket
No. 114).

and other interests, listing their value in an unknown amount. (Docket No. 43).

Debtor scheduled a secured claim for MCP Funding I, LLC ("MCP") in the amount of $10,289,000, secured by the four rigs and by a $1 million certificate of deposit.  Debtor scheduled no other secured creditors.  (Docket No. 43).  Debtor scheduled $391,633.12 in unsecured priority claims, and $8,217,979.00 in unsecured nonpriority claims.  (Docket No. 236).

Bishop testified that, on the petition date, Debtor was involved in drilling a well, the Vieman well in Brazoria County, Texas.  He testified that Debtor was running out of cash.  He testified that Debtor's approach to its cash flow woes was to complete the Vieman well, and to sell its drilling rigs and oil and gas properties to pay creditors.

On May 15, 2009, Debtor filed a plan and disclosure statement.  The plan generally contemplated the sale of Debtor's drilling rigs and Debtor's oil and gas properties, and the use of the sale proceeds to pay claims.  (Docket Nos. 247, 248).[3]

---

[3]Debtor noted in the disclosure statement that operations on the Vieman well had been temporarily suspended after initial tests did not produce hydrocarbons.  By May 15, 2009, the date on which the disclosure statement was filed, the Vieman well was not anticipated to play a significant role in providing funds for distribution to creditors.

## Vieman Well

Bishop testified that, in order to complete the Vieman well, Debtor obtained a cash infusion of $3.3 million from its parent company.[4]  Debtor's monthly operating report for November, 2008 indicates that Debtor had approximately $1.57 million in cash on November 18, 2008, the petition date, and had approximately $5.05 million in cash at the end of November, 2008. (Trustee's Exhibit 2).

By October 12, 2009, Debtor had determined that the Vieman well was a dry hole, meaning that it does not produce oil and gas in commercial quantities.  (Docket No. 392).  Debtor ultimately obtained authorization to convey its interest in the Vieman well to Endeavour Oil & Gas, Inc., in exchange for Endeavour's assumption of certain of Debtor's liabilities relating to the well.  (Docket No. 428).

## Drilling Rigs

On February 3, 2009, MCP filed a motion for relief from stay, seeking to liquidate its collateral, including the four drilling rigs.  In its motion, MCP asserted a debt in the original principal amount of $11 million.  The motion was set for hearing on March 2, 2009.  (Docket No. 121).

---

[4]Debtor's disclosure statement indicates that Debtor's parent is Turnkey E & P, Inc., a company listed on the Vancouver Stock Exchange in Canada.  (Docket No. 247)

On February 23, 2009, Debtor responded to MCP's motion for relief from stay.  In its response, Debtor stated that it intended to file a motion to sell the four drilling rigs.  Debtor asserted that MCP was protected by an equity cushion of approximately $2.625 million, based on an appraisal valuing the rigs at $35 million.[5]  Debtor did not oppose relief from stay as to a $1 million certificate of deposit, and offered additional adequate protection payments of $50,000 per month.  (Docket No. 149).[6]

At the hearing on MCP's first motion for relief from stay, held on March 2, 2009, Debtor, MCP, the Committee, and the taxing authorities presented a proposed agreed form of order. The order, which was entered on March 2, 2009, granted relief from stay as to the $1 million certificate of deposit, and directed Debtor to make adequate protection payments of $85,489.20 per month.  The adequate protection payments were to continue until July 2, 2009, unless further extended by agreement between Debtor, MCP, and the Committee, or if a motion to sell or a plan with a purchase and sale agreement were pending on July 2, 2009, until the court entered an order on the sale motion.

---

[5]The appraisal is not in evidence.

[6]MCP's first motion for relief from stay was also opposed by the Committee and several taxing authorities.

6

Bishop testified that Debtor ceased making adequate protection payments to MCP in July, 2009.

On July 8, 2009, MCP filed a second motion for relief from stay regarding the four drilling rigs. (Docket No. 307). Debtor filed a response to MCP's second motion for relief from stay on August 7, 2009. (Docket No. 335). The motion was set for hearing on October 30, 2009.

At the hearing on the instant application, Bishop testified that, on behalf of Debtor, prior to the October 30, 2009 hearing, he had been negotiating toward a lease agreement for the rigs that would provide Debtor with $12 million over approximately 36 months, plus a purchase option allowing the lessee to purchase the rigs for $7.5 million each.

Bishop testified that he relied on the business judgment of the Debtor in forming his own belief that the Debtor's valuation of the contracts was fair.

On October 23, 2009, Debtor filed a motion for approval of a rig lease agreement with Administradora En Proyectos De Campos S.A. De C.V ("APC"), a company located in Mexico. (Docket No. 398). Debtor also filed a motion for continuance of the October 30, 2009 hearing on MCP's second motion for relief from stay, or, alternatively, a hearing on the rig lease motion filed on October 23, 2009 to take place on October 30, 2009. (Docket No. 399).

By order entered on October 26, 2009, the court, <u>inter alia</u>, set a hearing on Debtor's motion for continuance of the hearing on MCP's second motion for relief from stay, indicating that the motion for continuance would be denied unless Debtor and MCP presented an agreed order.  The order entered on October 26, 2009 also set a pretrial conference on the rig lease motion, and set a status conference regarding the case.  The matters set for hearing were all set to take place on October 30, 2009, the date set for hearing on MCP's second motion for relief from stay. (Docket No. 402).

At the hearing on October 30, 2009, the court postponed consideration of the pretrial conference on the rig lease motion and the status conference until after the evidence on MCP's motion for relief from stay.  (Trustee's Exhibit 22).

At the hearing on MCP's motion for relief from stay, MCP asserted that Debtor had no equity in the rigs, and had no prospect for an effective reorganization.  Debtor asserted that it had equity in the rigs, and that the rig lease agreement would allow Debtor to effectuate a reorganization.  (Trustee's Exhibit 22).

At the October 30, 2009 hearing on the motion for relief from stay, MCP put on the testimony of Randy Shumate, the president of Midland Capital Partners, the parent of MCP. Shumate testified, <u>inter alia</u>, that a provision in MCP's security

8

agreement required that the rigs be maintained in the United States.  He testified that MCP was concerned about relocating the rigs to Mexico because of a risk of difficulty in obtaining possession of the collateral if APC defaulted on the proposed rig lease agreement.  He testified that neither Debtor nor APC had provided any financial information regarding APC to MCP.[7] (Trustee's Exhibit 22).

At the October 30, 2009 hearing on the motion for relief from stay, Shumate testified that Debtor's debt to MCP was $10,745,321.76.  An appraiser called by MCP, Ricky Parks, testified that, in his opinion, the aggregate value of the rigs as of August 19, 2009 was between $6.7 million and $8.2 million. (Trustee's Exhibit 22).

At the October 30, 2009 hearing on the motion for relief from stay, Debtor called as witnesses Richard Stites, Debtor's vice president, and Robert Tessari, Debtor's president and CEO.  Stites testified generally as to Debtor's cash flow, and testified that the rig lease agreement was necessary for a reorganization of the Debtor.  Tessari testified generally that he had never encountered problems in returning a rig from Mexico to the United States.  (Trustee's Exhibit 22).

---

[7]Counsel for MCP stated in argument at the October 30, 2009 hearing that MCP had not been notified of the identity of the proposed lessee of the rigs until the date on which the rig lease motion was filed.  He stated that MCP was not consulted on development of the rig lease proposal.  (Trustee's Exhibit 22).

At the conclusion of the October 30, 2009 hearing on the motion for relief from stay, the court lifted the stay, finding that Debtor had no equity in the rigs, and had "bet the company on a transaction with no due diligence of the counterparty whatsoever." (Trustee's Exhibit 22).

At the hearing on the instant application, Bishop testified that, at the motion for relief from stay hearing, Debtor did not call a witness to present an appraisal of the rigs. He testified that Debtor did not call a witness from APC to testify about the financial wherewithal of APC to perform its obligations under the proposed lease, if the proposed lease were approved.

Bishop testified that he disagreed with Judge Steen's ruling lifting the stay, and still disagrees with the ruling. Although Debtor filed a motion for reconsideration, Debtor did not appeal the ruling lifting the stay. Bishop testified that, after the stay was lifted, MCP began the process of foreclosing on the rigs.

<u>Oil and Gas Properties</u>

Bishop testified that Debtor negotiated with two entities, Osyka and RiverStone, toward a sale of Debtor's oil and gas properties, during the spring of 2009. He testified that he believed that Debtor would reach an agreement with one of the two entities before a plan was filed. Bishop testified that Debtor

10

did not reach an agreement for sale of the properties before a plan was filed.

On June 23, 2009, Debtor filed a motion seeking approval of bid procedures ultimately leading to a sale of the oil and gas properties.  The procedures proposed by Debtor called for a bid deadline of July 27, 2009, and an auction to be held on July 29, 2009.  In order to become qualified bidders, Debtor proposed, _inter_ _alia_, that each bidder be required to execute an asset purchase agreement on the form attached to the motion; provide financial statements and/or a letter of credit to demonstrate the bidder's ability to close the transaction; and deposit $200,000 in cash.  (Docket No. 276).

The bid procedures proposed by Debtor drew an objection from Schlumberger Technology Corp. and Baker Hughes Oilfield Operations, Inc., entities which each asserted claims secured by liens as to four wells, on grounds including that the bid procedures did not identify which interests were to be sold, did not allocate the bid among specific assets, and did not permit secured creditors to credit bid.  (Docket No. 296).  The bid procedures also drew an objection from RiverStone, on grounds the bid procedures permitted Debtor to selectively withhold information from potential bidders, and permitted Debtor to reject all bids.  (Docket No. 297).

11

After a hearing held on June 30, 2009, the court approved the bid procedures proposed by Debtor.  The order set a hearing to approve the sale on August 17, 2009.  (Docket No. 300).

The hearing scheduled for August 17, 2009 regarding the sale of Debtor's oil and gas properties did not go forward. Bishop testified that RiverStone made a bid, but that the sale did not go forward because Debtor and the Committee determined that the bid was not in the best interest of the estate.

The order approving the bid procedures was prepared by Applicant.  It incorporated sale procedures prepared by Applicant.  The sale procedures did not require that the form of Asset Purchase Agreement attached to the bid procedures motion be used, without alterations, but rather required only that bidders accompany the bid with a redlined copy showing differences between the bid submitted and the form of Asset Purchase Agreement prepared by Applicant.  (Applicant's Exhibit C).  The bid submitted by RiverStone is not in evidence.

<u>Plan and Disclosure Statement</u>

Debtor filed a plan and disclosure statement on May 15, 2009.  The plan reflected, with respect to the rigs, that Debtor was negotiating a joint venture agreement with Centex Global Energy, L.P. ("Centex") which included a sale of the drilling rigs.  At the time Debtor filed the plan, Debtor had not reached

12

an agreement with Centex.  (Docket No. 248).  As the court has
previously noted, neither the joint venture with Centex nor the
later proposed lease to APC took place, and MCP proceeded with
foreclosure of the rigs.

      With respect to the oil and gas properties, the plan
provided that Debtor contemplated supplementing the plan with a
proposed transaction.  (Docket No. 248).  As the court has
previously noted, Debtor filed a motion for approval of bidding
procedures, bidding procedures were adopted, and a bid was
received, but Debtor determined not to present the bid to the
court for approval.

      The disclosure statement was set for a hearing on June
30, 2009.  (Docket No. 256).  The hearing was canceled, by order
entered on June 24, 2009, after Debtor advised the court that the
disclosure statement was not ripe for approval.  (Docket No.
281).  There was no further plan filed by Debtor.

<u>Services Addressed in the First Interim Application</u>

      In the first interim application, covering the period
from November 17, 2008 through February 24, 2009, Applicant
divided its services into nine categories:  Administrative; Cash
Collateral and Adequate Protection; Schedules and Statement of
Financial Affairs; Lift Stay; Plan and Disclosure Statement;

Claims Objections; Asset Sales; Executory Contracts; and Spirit Lawsuit.[8]  (Docket No. 232).

There is no dispute with regard to the services rendered in the first application period, except as to the plan and disclosure statement and asset sales.

The time records attached to the first interim application with respect to the plan and disclosure statement reflect that Applicant commenced analyzing issues for the plan and drafting the plan and disclosure statement during early February, 2009.  Debtor's initial exclusive period to file a plan was set to expire during March, 2009.  The time records reflect that Applicant prepared and filed a motion to extend exclusivity, and continued drafting the plan, during the first application period.  (Docket No. 232).

The time records attached to the first interim application with respect to asset sales reflect that Applicant prepared and filed a motion to sell pipe (a miscellaneous asset of the estate), prepared for a hearing on the motion to sell the pipe, and began work on the motion to sell the rigs (including the preparation of bid procedures).  (Docket No. 232).

---

[8]This lawsuit was removed from the 49th Judicial District Court of Zapata County, Texas, and concerned an oil and gas lease regarding property located in Zapata County, Texas.  It became Adv. No. 09-3080.

The first interim application was granted, by order entered on August 18, 2009.  Applicant was allowed $176,942.00 in fees, and $8,422.70 in expenses.  (Docket No. 351)

### Services Addressed in the Second Interim Application

In the second interim application, covering the period from February 25, 2009 through June 24, 2009, Applicant divided its services into the same nine categories as in the first application.  (Docket No. 368).

There is no dispute with regard to the services rendered in the second application period, except as to the plan and disclosure statement and asset sales.

The time records attached to the second interim application with respect to the plan and disclosure statement reflect that Applicant prepared for a hearing on the motion to extend exclusivity, negotiated on discovery issues related to the motion to extend exclusivity, continued working on drafting the plan and disclosure statement, reviewed the proposed rig lease motion, and prepared a motion for continuance of the disclosure statement hearing.  Applicant also included in this category preparation of a motion to present information under seal at the hearing on the motion to extend exclusivity.  (Docket No. 368). The motion to present information under seal (Docket No. 187), and a motion for expedited hearing on the motion to present

information under seal (Docket No. 188) were withdrawn at the hearing on the motion to extend exclusivity (Docket No. 195).

The time records attached to the second interim application with respect to asset sales reflect that Applicant reviewed correspondence regarding a proposed sale to Osyka, made extensive revisions to the proposed asset sale and purchase agreement (presumably with Osyka), negotiated regarding the terms of, and prepared, the bid procedures motion, made extensive revisions to the proposed asset purchase agreement to be attached to the bid procedures motion.  During early May, 2009, Applicant's services included various correspondence regarding the breakdown of negotiations toward a sale.  During June, 2009, the services included review of new provisions of an asset purchase agreement submitted by RiverStone (Docket No. 368).

The second interim application was granted, by order entered on September 28, 2009.  Applicant was allowed $314,770.50 in fees, and $11,596.42 in expenses.  (Docket No. 386).

### Services Addressed in the Third Interim Application

The third interim application was filed on December 31, 2009, approximately six weeks after the Chapter 11 Trustee was appointed.  In the third interim application, covering the period from June 25, 2009 through October 24, 2009, Applicant divided its services into nine categories:  Administrative; Cash Collateral; Lift Stay and Adequate Protection Issues; Plan and

16

Disclosure Statement; Claims Objections; Asset Sales; Executory Contracts; Spirit Lawsuit, and BJ Services Litigation.  (Docket No. 455).

The Chapter 11 Trustee objected to the third interim application.  In the Trustee's objection to the third interim application, the Trustee raised the issue that over half the time spent by Applicant appeared to relate to Debtor's proposed sale of the drilling rigs to an entity in Mexico, which sale was not concluded.  Trustee reserved the right to object to a final fee application (Docket No. 477).  There is no dispute with regard to the services rendered in the third application period, except as to asset sales and MCP's second motion for relief from stay.

The time records attached to the third interim application with respect to asset sales reflect that Applicant prepared extensively for the hearing on the bid procedures motion, negotiated two farmout agreements, continued review of the RiverStone offer, prepared a motion to sell pipe, prepared for hearings on the farmout motion and the motion to sell pipe, began drafting the rig lease motion, and drafted a motion to abandon the Vieman well.  (Docket No. 455).

The time records attached to the third interim application with respect to the motion for relief from stay reflect that Applicant prepared a response to MCP's second motion for relief from stay, prepared a motion for continuance of the

first hearing set on MCP's second motion for relief from stay,
and conducted and responded to discovery regarding MCP's second
motion for relief from stay.  (Docket No. 455).

### Services Addressed in the Final Application

In the instant application, Applicant seeks final
allowance of the fees allowed on an interim basis on the three
interim applications.  Applicant also seeks allowance of $46,423
in fees and $3,230.18 in expenses for the period from October 25,
2009 through November 20, 2009, less a voluntary reduction of
$25,000.00.  (Docket No. 696).

Applicant did not present a narrative breakdown by
category as to the services rendered in the final application
period.  The time records attached to the final application for
the period from October 25, 2009 through November 20, 2009
reflect that Applicant divided its services during that period
into four categories:  General/Administrative, Lift Stay, Asset
Sales, and Spirit Litigation.  (Docket No. 696).

The Chapter 7 Trustee objects to the allowance of any
fees for the period from October 25, 2009 through November 20,
2009.  (Docket No. 696).

The time records for the period from October 25, 2009
through November 20, 2009 with respect to the General/
Administrative category reflect that Applicant downloaded various
documents and pleadings filed with the court, prepared a monthly

18

operating report, traveled from Dallas to Houston for a hearing on the case, and organized documents and pleadings. (Docket No. 696).

The time records for the period from October 25, 2009 through November 20, 2009 with respect to the Lift Stay category reflects that Applicant prepared for the October 30, 2009 hearing on the motion for relief from stay, attended a deposition of MCP's appraiser, worked on a memorandum regarding the effect of Mexican law on Debtor's proposal to have the rigs leased by an entity planning to move the rigs to Mexico, attended the hearing on the motion for relief from stay, and prepared a motion for reconsideration. (Docket No. 696).

The time records for the period from October 25, 2009 through November 20, 2009 with respect to the Asset Sales category reflect that Applicant prepared a brief in support of the rig lease motion, and prepared for the October 30, 2009 hearing. (Docket No. 696).

The time records for the period from October 25, 2009 through November 20, 2009 with respect to the Spirit Litigation reflect that Applicant reviewed a settlement demand, and prepared for a mediation. (Docket No. 696).

<u>Conclusions of Law</u>

Section 330 of the Bankruptcy Code provides in pertinent part:

19

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103 –

    (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

    (B) reimbursement for actual, necessary expenses.

* * *

(3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

    (A) the time spent on such services;

    (B) the rates charged for such services;

    (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

    (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

    (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

    (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

20

> (4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for -
>
>> (i) unnecessary duplication of services; or
>> (ii) services that were not -
>>
>>> (I) reasonably likely to benefit the debtor's estate; or
>>> (II) necessary to the administration of the case.

11 U.S.C. § 330.

In <u>Matter of Pro-Snax Distributors, Inc.</u>, 157 F.3d 414 (5th Cir. 1998), the Fifth Circuit held that, in assessing whether to allow fees incurred in a Chapter 11 case prior to the appointment of a trustee, the court must consider whether the services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate.  157 F.3d, at p. 426.

The court considers both prospective and retrospective viewpoints when applying <u>Pro-Snax</u> in conjunction with Section 330.  Prospectively, the court requires that the attorneys' services "were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case" in accordance with Section 330(a)(3)(C).  Then, the court retrospectively evaluates whether the services resulted in an identifiable, tangible, and material benefit to the estate-recognizing, of course, that a service may benefit the estate without resulting in a quantifiable or monetary return.  <u>In re MSB Energy, Inc.</u>, 450 B.R. 659 (Bankr. S.D. Tex. 2011).

In the instant case, the court finds that Applicant's services regarding asset sales were necessary to the administration of the case at the time the services were rendered.  The success of the case depended on the ability of the Debtor to liquidate its assets for a price sufficient to generate funds to pay creditors.

Resolution of whether the fees with respect to asset sales are allowable depends on a retrospective analysis of whether the services resulted in an identifiable, tangible, and material benefit to the estate.  Trustee advances the argument that the creditors of the estate would have been better off if the estate had merely ceased doing business, and distributed funds on hand to creditors.  However, the court notes that $3.3 million of the funds Debtor had on hand were contributed by Debtor's parent, postpetition, for the purpose of completing the Vieman well.  Neither Debtor nor its counsel could have been required to anticipate that the well would not produce hydrocarbons in commercial quantities.

It is clear that the work on asset sales did not produce a direct quantifiable monetary return.  The rigs were not sold or leased, and were foreclosed by MCP.  No sale of the oil and gas properties took place before the appointment of the Chapter 11 Trustee.  Moreover, the bid procedures drafted by Applicant, and submitted to the court, were sufficiently open to

further negotiations that they resulted in Debtor's ultimate
rejection of what appears to have been a qualifying bid, on
grounds there were too many terms not specified.  The court
concludes that Applicant's work on asset sales, at least as
applied to the drilling rigs, and oil and gas properties, did not
produce an identifiable, tangible, and material benefit to the
estate.  The remainder of the services with respect to asset
sales (including the motions to sell pipe, and the work on the
two farmout motions) did produce an identifiable, tangible, and
material benefit to the estate.  The court concludes that the
allowable fees for asset sales total $47,613.50.[9]

          With respect to the plan and disclosure statement, the
work was necessary to the administration of a Chapter 11 case.
However, both the plan and disclosure statement were prepared and
filed without adequate negotiation of the material terms.  What
was filed was essentially the skeleton of a plan, with hopes that
the material terms would be filled in later through negotiation
and separate processes (including the bid procedures motion).
Although there was some benefit from the services rendered in
this category, the time spent was unreasonable in light of the

---

[9]This amount represents $12,710.50 during the first
application period, $4,882.00 during the second application
period, $28,251.00 during the third application period, and
$1,770.00 during the final application period.  The total is
$162,615 less than what was sought for this category in the
aggregate.

skeletal plan actually filed.  The court concludes that the
allowable fees for plan and disclosure statement total
$25,897.25.[10]

With respect to Applicant's services rendered in
defense of MCP's second motion for relief from stay, the services
were necessary to the administration of the case.  However, they
produced no identifiable, material, and tangible benefit to the
estate.  Debtor's success at that point in the case depended on a
successful defense of MCP's motion for relief from stay.  Yet
Applicant came to court unprepared to present evidence as to the
value of the rigs, an issue which was much disputed; and proposed
a lease for the rigs, without any due diligence as to the
proposed counterparty to the rig lease agreement, and which
appear to have violated its covenants with MCP.  The court
concludes that no fees are allowed for defense of MCP's second
motion for relief from stay.[11]

With respect to the services in the final application
period in the General/Administrative and Spirit Litigation, the
court finds that these services were of benefit to the estate.

_____

[10]This amount represents the entire amount sought during the
first and third application periods, plus half the amount sought
during the second application period.  The total is $20,085.75
less than what was sought for this category in the aggregate.

[11]Applicant sought $50,756.00 on this category.

The court concludes that the fees for these services are allowable, in the amount of $9,133.50.

The court concludes that the final amount of fees and expenses allowed should be $485,087.75 in fees, plus $37,730.99 in expenses, for a total of $522,818.74.[12]

Based on the foregoing, a separate Judgment will be entered finally allowing fees in the amount of $485,087.75, expenses in the amount of $37,730.99.

Signed at Houston, Texas on October 1, 2012.


LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE

---

[12]Applicant has received $445,483.55 of this amount, leaving $77,335.19 owing as a Chapter 11 administrative expense.